AUTOMATIC ARC WELDING CO. v. A. O. SMITH CORPORATION. *

No. 4728.

Circuit Court of Appeals, Seventh Circuit. July 29, 1932.

* Rehearing denied November 2, 1932.

Albert C. Nolte, of New York City, and William F. Buckley, of Milwaukee, Wis., for appellant.

Amasa C. Paul, of Minneapolis, Minn., William H. Davis, of New York City, and Arthur W. Fairchild, of Milwaukee, Wis., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

EVANS, Circuit Judge.

Appellant sued to enjoin the infringement of three patents: No. 1,648,560, issued November 8, 1927, covering electric arc welding; No. 1,278,985, issued Setember 17, 1918, covering portable electric arc welding apparatus; No. 1,648,562, issued November 8, 1927, covering electric arc welding control methods and means; and to collect damages for past infringements. All three patents were issued to H. D. Morton and covered methods and means for *automatically* welding with the electric arc.

Appellee in its arc welding work used three different metallic arc welding mechanisms referred to in the record as the C-1 system, the BM system, and the Exhibit 1 system. The court at the close of the trial announced its decision and made findings of fact favorable to appellee. Below appear material quotations from the opinion.[1]

Appellant has fully appreciated, as is evidenced by its two lengthy briefs covering nearly 300 pages, the heavy task with which it is confronted.

The District Court chose to rest its decision solely on noninfringement. It did not pass upon the defense of invalidity.

---

[1] "The defendant here has disclosed, as I think, fully what it is doing with respect to electric arc welding, and I feel that, except for what discussion might arise with respect to the so-called BM system, that when the defendant showed not only what it was doing in welding, through what has here been called the C-1 head, and showed what I may call the genesis of that method and that procedure, that except for what there may be left of the BM discussion, this case was at an end on the issue of infringement. ⁴ ⁴ ⁴

"Now, from the beginning of the case I was unable to see how this art of electric welding could be prescribed, if I may use that word, so as to exclude from it a rather ample showing as to the natural recourse to the broader art wherein it was sought to deal with control methods over an electric arc no matter for what purposes it was used; * * * for example, to the lighting art, which involved the use of an arc for that purpose, and wherein there was a disclosure, rather clear, of the evident necessity of resorting to some sort of control purposes—* * *

"* * * * the ready resort that was made by the witnesses to, ⁴ * * a perfect conversion of structures used in the moving picture projecting art, to a welding apparatus, was a conclusive demonstration. •That does not mean that through that conversion there was derived or there was accomplished the highest degree of perfection of a welding apparatus. That is not the conclusion at all. But

it showed the adaptability of control means used in that art, if we call it the lighting art, to this welding art.

"⁴ * ⁴ that being so, * ⁴ * the proofs of infringement are to be considered in the light of their efficacy, and if not their efficacy then in the light of the concession that is here made, ⁴ * ⁴ that the structure such as is found in Sessions, whatever be said about Morton, is accorded a distinctive position as illustrative of a radical, basic difference; and we come from that immediately to the work that was done by the defendant in the development of the structure now referred to as the C-1 structure; * ⁴ * in considering art structure such as Sessions discloses, we have the right, we are under the necessity, of imputing to that ⁴ ⁴ ⁴ structure and that sort of work either a law or a conception of mechanical means with the implication of mechanical methods; and if what Sessions developed was new, he was entitled, within some range, as between himself and other workers in the art, some range of right to perfect, to amplify, or to enlarge his development. In other words, if we start with the idea that what he then disclosed was basically and radically different from anything claimed on behalf of Morton, then, as between Sessions and Morton—Sessions being earlier and being different, which is the real point—was entitled to as much liberality in the way of future development as Morton could at any time claim on behalf of his disclosure; that being so, I felt, and I now feel, that notwithstanding suggestions that are made here respecting the possibility of an approach by Exhibit C-1 to some element or some idea that might be found in Morton's system, C-1 is, after all, a developed Sessions structure, dealing with and accomplishing, it may be conceded or contended, a far more satisfactory welding control means, but which control means are mechanical and, ⁴ * ⁴ were made upon recourse ⁴ ⁴ ⁴ to the available larger art of control mechanism.

"⁴ * * I have no difficulty whatever in finding, first, upon the concession that was made here that the method pursued by the defendant with respect to Exhibit 1 is not infringing, and second, the practice of the process, or the use of the structure shown in evidence as Exhibit C-1, is clearly beyond the range of infringement.

"That leads to the consideration of the BM method, ⁴ * ⁴ I think I understand why it was being discussed in view of its being discarded. ⁴ * ⁴ the parties, after all, joined in a feeling that they would like to have some expression of opinion from the judicial tribunal respecting the status of that system. * ⁴ ⁴ it being in evidence here that that system, ⁴ ⁴ ⁴ was discontinued prior to the filing of the bill, * ⁴ ⁴ the plaintiff must support its bill in some way by a showing that, in equity, it was entitled to relief as against that system because of the likelihood of recurrence to it. ⁴ ⁴ * I will simply content myself with this announcement that upon the showing here, whatever may be said about the BM system, the difficulty that arises upon the issue of infringement when it comes closely to a consideration of the BM system, is the development and establishment of any theory which may ascribe to Morton a monopoly, practically, of all control systems. I am satisfied to accept the analysis that has been given of the proofs here with respect to this BM system on behalf of the defendant, and a decree may be taken dismissing the bill for want of equity as to all of the systems that have been the subject matter of evidence here."

We quite agree with it that in patent suits Equity Rule 70½ (28 USCA § 723) does not necessitate specific findings on the issues determinative of validity, if the court be satisfied that the patent is not infringed. There may be cases where both issues should be met and covered by findings. Other cases, however, do not call for findings on validity. There exist reasons for not passing on validity unless required so to do. Time may reveal the existence of prior art not shown upon the trial. The greater utility and usefulness of the invention, if a longer time be allowed, may in a doubtful case determine validity. It is for these and other reasons that a court ordinarily disposes of a patent suit on the issue of infringement, if the facts permit it so to do. It must be admitted, however, that there are patent suits, and many of them, where the question of infringement is so dependent upon the state of the prior art that a court can hardly fix the status of the patent without determining its validity.

Infringement here depends largely upon the status of the Morton patents. If they cover pioneer inventions, as contended for by appellant, the argument for infringement is greatly strengthened. The standing of the inventions in the art turns upon (1) the scope to be given the prior Sessions patent and (2) whether the electrode feed regulation in the carbon arc lamp and other fields is analogous art.

In reaching its decision, the court in its short memorandum put its finger upon the three vital issues, the disposition of which determines this issue of infringement. (a) Was electric feed regulating means developed in the carbon arc lamp and electric furnace art analogous to that in which Morton worked? (b) The dominant position of the Sessions patent in the metallic arc welding art. (c) The separate consideration of appellee's three structures, known as C–1, BM, and Exhibit 1.

The court said appellant no longer claimed infringement by appellee's structure known as Exhibit 1. It likewise found, independently of such concession, that said model (Exhibit 1) did not infringe.

Without stating our reasons at length, we will limit ourselves to expressing our conclusion, which is that the holding of noninfringement by Exhibit 1 was clearly right. Appellant's contention that Exhibit 1 might be easily changed so as to infringe needs no comment.

We likewise agree with Judge Geiger in his conclusion respecting analogous art. We think the apparatus found in the regulation of the feed of a carbon electrode in an arc lamp and the electrode feed regulation in a moving picture machine was a part of the prior art which confronted Morton.

As the disposition of this appeal turns somewhat upon the soundness of this conclusion, a statement of our reasons for reaching it is justified.

The determination of what is analogous art involves somewhat the same tests as are applied to ascertain patentable novelty. Numerous standards have been laid down, but no rule of thumb is satisfactory. This court attempted to define a test in A. J. Deer Co. v. U. S. Slicing Machine Co., 21 F.(2d) 812, 813, which is probably as satisfactory as may be found.

"If the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then we are of opinion that such arts must be said to be analogous, and, if the converse is true, they are nonanalogous arts."

The over-elasticity of this test and the necessity for fact support make its universal application impossible. It is surely, not capable of mathematical demonstration. When may the court say that a person possessing mechanical skill and knowledge of the art will be subject to '"an appeal" from another art? Perhaps greater definiteness would be attained if we said an inventor is chargeable with the knowledge and doings of men working in the same field.

Appellant's counsel relies on this same decision, and it is doubtless as strong a case as can be found on its side. The facts in that case, nevertheless, serve to emphasize the distinctions upon which we now rely for our conclusion in this case. In the Slicing Machine Case, the court was considering the analogies in the meat slicing and the saw log cutting arts. While in one sense it might be said there was a common art—the cutting or slicing art—it was developed in different industries—the meat slicing industry and the lumber industry. There is a vast difference in the size of a saw log and a slab of bacon. There is likewise great difference in the structure and solidity of meat and saw logs. There was similarity, it is true, between the machinery which the inventor in the saw log

industry had designed for cutting saw logs into lumber and that used by the inventor of the meat cutting machine for cutting slabs of bacon.

But would one who was confronted by the problem of slicing bacon be chargeable with the state of the art as it had developed in the saw log business? The court answered, "No." Why not a similar answer here? Our reply is—Because of greater similarity in the two problems and the greater similarity of means adopted by the electrical engineer to solve the similar problems.

Morton's problem was that of the electrician or the electrical engineer.

To borrow appellant's language:

"One of the principal objects of the inventions involved in this suit is the provision of methods of and means for feeding the welding rod automatically instead of manually, and for automatically varying the speed at which the welding rod is fed, in order to maintain the arc length substantially constant and insure uniformity of welding conditions."

Passing for the moment the automatic as distinguished from the manually fed rod, which is disclosed in the not analogous but identical art, and coming to the phase which invokes the question of analogous prior art, the electrical engineer would doubtless have examined the Metzger patent for a welding machine, which patent covered an electric welding machine and had for its object the provision of an automatic device whereby an effective joint between metallic surfaces might be made in a simple and efficient manner. Metzger said:

"In order to make the welding machine entirely automatic, I provide automatic feeding and arc drawing mechanism, such as is usually provided in arc lamps."

▪ Morton would likewise be chargeable with the knowledge imputed by the Slawianoff patent, which dealt with a new process of casting metals and metallic articles or wares by means of an electric arc. Although this patent was issued in 1897, the applicant said:

"Electrical casting cannot be carried on without means of regulating the length of the arc. Any of the lamp-regulators may be employed as automatic regulators. It is only necessary to remove the carbon-holder and to place in the other the rod to be melted and finally to provide the solenoid or electromagnet with a greater number of coils."

Standeford's patent covered a continuous feed for arc lamps. His invention related to "continuous feeding means for arc lamps, and while it may be used for other purposes, it is especially adaptable for arc lamps used in connection with motion picture machines, where a steady light of a predetermined candle power is necessary to obtain the best results. The invention provides for constant and automatic feeding of the lamp carbons by a rotary motor, which is connected in parallel with the lamp and consequently maintains a uniform arc gap between said carbons."

Scherff covered his invention of an illumination controller by a patent which contained this statement:

"The importance of maintaining constant the intensity of the illuminating arc in motion picture projecting apparatus is well known. As the carbons or electrodes of the arc light are consumed, however, and as the distance between them increases, the voltage across the arc increases and the current diminishes, thus lessening the intensity of illumination. Furthermore, since the positive carbon is consumed faster than the negative carbon, the center of illumination thereby tends to shift away from the axis of projection where, as is commonly the case, the carbons are alined in a plane transverse to said axis."

After describing the structure to secure this desired end, he says:

"According to the present invention the feeding of the carbons toward each other is effected automatically through the mechanism controlled by the voltage across the arc, or, alternatively, by the volume of current therethrough. Instead of employing a special motor to drive the feed mechanism, however, this is effected from a moving part, driving or driven, of the film-moving or reeling apparatus of the motion picture machine. * * * control may be effected through variations in the arc current instead of by voltage variations, in which case the controlling circuit connections may be either in series or in parallel with the arc. In any case, the control of the clutch operation should be such as to minimize fluctuations in the illumination intensity of the arc; and hence, the clutch-operating mechanism should be so constructed and adjusted as to be responsive to relatively very slight changes in voltage or current conditions in the arc."

▪ Obviously, the problem of the electrical engineer in the other fields was so similar,

and necessarily so, that one trained as an electrical engineer must be chargeable with the knowledge common to those who labored in those fields.

It is not the difference between the automatic metallic arc welding art and the illuminating arc art that is involved. To point out the difference between these two arts begs the question. In both cases the similarity, as well as the dissimilarity, under scrutiny must be limited to the means available to a worker in either art for maintaining constant the length, and therefore the intensity, of the arc. It seems to us that an electrical engineer, or other worker skilled in this art, would naturally turn to other electrical fields such as lighting and adopt the means there commonly used to automatically regulate the length of the arc, and it would matter not whether the arc was produced by a carbon or a metallic electrode.

█ It is seldom that patents disclose an acknowledgment of the similarity of the two arts. Here, engineers working either in the welding or other arts recognized the binding effect of the means adopted by those laboring in the light or film art. We therefore conclude that the District Court was right in holding the disclosures in these other patents to be prior art.

It is, however, to Sessions that appellee turns as the inventor who not only clearly pointed the way for appellee's type, C–1, but also served as the successful eliminator of Morton's pretensions to occupancy of the role of pioneer. Not only does Sessions occupy a large part of the field himself, but he left little or nothing for Morton to monopolize. The corner stones and boundary lines of Morton's field of monopoly were fixed by Sessions. He and the others above referred to left only a small tract for Morton to monopolize. In fact, some of the claims of the Morton patent, notably claims 14 and 23, patent No. 1,648,560, are clearly too broad to be sustained as valid.

In his application, Sessions said:

"The object of this invention is to provide a method of procedure and apparatus for the use therein, whereby such an electrode having an indefinite length may be fed continuously, and, if desired, automatically, at the proper rate of speed to insure the expeditious and yet thorough welding of the joint between such juxtaposed edges. To the accomplishment of the foregoing and related ends the invention, then, consists of the steps and means hereinafter fully described and particularly pointed out in the claims."

"The metallic electrode being of an indefinite length, and means being provided as just described for continuously feeding the same onto the work, there need be no interruption in the operation during the handling of any particular piece or section of tubing. Uniformity of result is thus assured and a satisfactory speed can be obtained as well; while a material saving is effected in the amount of current consumed."

* * * * * *

"The apparatus illustrated in Figs. 4 and 5 is further elaborated by the inclusion of means for automatically regulating the rate of feed of the wire electrode B to correspond with the progress of the welding operation. In addition to the feed rolls 1 and the pressure rolls 2 which are disposed substantially as before, there is provided in this last form of apparatus a solenoid 14 that is adapted to be actuated by the current flowing through the work and the wire electrode.

* * * * * *

" * * * Accordingly, upon starting upon the apparatus, assuming the current to be on, (the circuit connections being controlled by a switch 20), if the shaft 17 is started rotating, the electrode will be fed forwardly until its end actually contacts with the juxtaposed edges of the tube A, thereby completing the circuit and causing such a flow of current as will actuate the solenoid to throw the clutch into reverse. The reversing of the feed will withdraw the electrode a trifle, just sufficient, in fact, to remove the end of the electrode the proper distance from said edges to establish an arc. With such arc established the flow of current from the circuit, although reduced, will still permit the clutch to drive the feed rolls forwardly and thus continuously feed the electrode at a rate capable of maintaining its end within such arcing distance, despite the gradual fusing of the end. The work being progressively advanced past the end of the electrode, the juxtaposed edges are brought substantially to a point of fusion as the melted material from the electrode is deposited between the same.

"Should the electrode be fed too rapidly, so as to again bring the same into actual contact with the work, the solenoid will be actuated by the increased flow of current to interrupt the feeding operation, or even to reverse the same. As soon, however, as the distance of the electrode from the work is restored to normal, the clutch is thrown into

the forward feeding position and the operation proceeded with. The operation of the solenoid may be very sensitive so that a very exact control of the feeding operation is secured, the wire electrode being advanced at just the proper speed to give the desired welding effect. The tension of spring 19 may be adjusted by means of a nut 22.

"In rolling up the sheet or strip of metal to preliminarily form the tube for use in the ordinary butt-welding operation, it is usual to stretch the outer surface of the sheet so that the juxtaposed edges may lie in substantially the same radial plane with respect to the axis of the tube."

Here then is a patent in exactly the same specific art—in the arc welding art—in fact in the metallic arc welding art, which preceded Morton and largely anticipated him. If we should exclude the analogous art heretofore referred to for the benefit of Morton, we would have to do likewise for Sessions. With this analogous art excluded, Sessions would have been a pioneer in an outstanding discovery—entitled to the most liberal construction of claims and the broadest range of equivalents, as to means. So construed, he would have either eliminated Morton or so clipped his wings as to leave him valueless. But if this pioneer status must be denied Sessions, as we hold because of the Keith, Thury, Slawianoff, Metzger, Scherff, and Standeford patents, these same patents must also similarly limit Morton. The same kind of construction, based on the same kind of prior art, must be given both.

■ But though limited as are the claims of Sessions as we construe them, they furnish the foundation upon which appellee built. While the engineer of appellee never saw the Sessions patent before he designed the Smith apparatus (C-1 type), he followed Sessions and improved upon him. Legally he was chargeable with knowledge of the art as disclosed by Sessions, and likewise, as against Morton, he was entitled to develop, practically, the structure Sessions disclosed in his patent. The improvement which engineer Stresau made for appellee's machines did not however infringe upon Morton.

Appellee's BM machine was developed after its C-1 machine. It employs a variable speed motor. It was early abandoned as a result of a possible conflict with the owner of another (Whiting) patent covering its biasing voltage. In fact, the record shows that both the BM machine and the Exhibit 1 machine were abandoned before any suit was begun. Likewise, appellee has found that the most satisfactory welding operation is performed by a manually operated machine.

Accepting as we do the trial judge's statement, "the difficulty that arises upon consideration of the BM system, is the development and establishment of any theory which may ascribe to Morton a monopoly, practically, of all control systems," we conclude, as did the District Judge, that as against Morton, appellee was permitted to use and practically develop the structure shown in the Sessions and Standeford patents. In so doing, he did not infringe Morton's patent.

It is unnecessary to limit or to attempt to define the claims of the Morton patent. If appellee kept within the teachings of Sessions, or of Sessions and Standeford, he was outside the reach of Morton. It was therefore not important to define what was left for Morton. So long as it kept within the boundaries of the Sessions field, appellee was not trespassing on Morton's preserves. [9] Error is assigned because the court did not admit in evidence the opinion of the patent official who decided the interference case between Morton and other inventors. To this proceeding appellee was not a party. This court has previously held that such an opinion is not admissible as evidence, and no reason has been advanced to cause us to change our views. Perry Auto Lock Co. v. Security Lock Co. (C. C. A.) 286 F. 101.

The decree is

Affirmed.