CRANE CO., Plaintiff,

v.

The **GOODYEAR TIRE & RUBBER COMPANY** and Goodyear Aerospace Corporation, Defendants.

No. C77–207A.

United States District Court,
N.D. Ohio, E.D.

Sept. 28, 1983.
As Amended Oct. 28, 1983.

Richard F. Stevens, Baker & Hostetler, Cleveland, Ohio, Henry L. Brinks, James B. Blanchard, William A. Webb, Hume, Clement, Brinks, Willian & Olds, Ltd., Chicago, Ill., for plaintiff.

John M. Glenn, Buckingham, Doolittle & Burroughs, Akron, Ohio, Sheldon Witcoff, Allegretti, Newitt, Witcoff & McAndrews, Chicago, Ill., for defendants.

## MEMORANDUM OF OPINION AND ORDER

KRENZLER, District Judge.

This is an action seeking damages for infringement of patents brought by plaintiff Crane Co. (hereinafter "Crane") against defendants The Goodyear Tire & Rubber Company and Goodyear Aerospace Corporation (hereinafter "Goodyear"). Defendant Goodyear denied any infringement and challenged the validity of Crane's patents which are at issue. The basis for defendant's claim of invalidity are as follows:

1) The claimed subject matter of the patent is found to have been "on sale" more

than one year before the filing date of its application;

2) The claimed subject matter of the patent is found to have been published prior to the filing date of the application;

3) The claimed subject matter of the patents was anticipated by prior art;

4) The claimed subject matter would have been obvious to a person skilled in the pertinent art at the time the inventions were made;

5) The specifications for the patents failed to set forth the best made of the invention;

6) The patents did not name the true inventors of the invention.

Defendant further counterclaimed alleging that plaintiff violated antitrust laws. The Court bifurcated the issues in the case and tried the issue of patent validity first.

## BACKGROUND

This action was commenced on June 6, 1977, when plaintiff filed a complaint against the defendants for alleged violations of the Patent Laws of the United States, 35 U.S.C. § 281 *et seq.* At issue are two patents that Crane holds concerning a feedback control system for the brakes of vehicles: U.S.Patent No. 3,724,916 (hereinafter " '916") issued April 3, 1973 and U.S. Patent No. 3,729,234 (hereinafter " '234") issued April 24, 1973. Crane is the assignee under both of these patents from Crane's employee, Mr. Edgar A. Hirzel.

Defendant Goodyear both answered and counterclaimed seeking declaratory relief pursuant to the provisions of 28 U.S.C. §§ 2201 and 2202 as to its claims of 1) unenforceability and invalidity regarding the Crane patents; 2) noninfringement of the patents; 3) alleged inequitable conduct; 4) alleged patent misuse by Crane.

An amended complaint was filed by plaintiffs on January 12, 1978.

Prior to being transferred to this Court in January of 1981, the instant case was before The Honorable Leroy J. Contie, Jr. On February 11, 1980, Judge Contie issued an order bifurcating the issues of patent validity of the Crane patents and the issue of liability and damages pursuant to Fed.R. Civ.P. 42(a). Also bifurcated were the other claims under both the amended complaint and the answer and counterclaim.

On November 3, 1982, a bench trial of the issues of the validity of the two Crane patents that are the subject matter of the amended complaint was commenced.

## FINDINGS OF FACT

An aircraft antiskid control system is a combination of electronic, hydraulic, and ·mechanical components which utilizes feedback control principles to control hydraulic pressure to the braking system of aircraft. When a pilot wishes to stop an aircraft, he operates a footbrake pedal, in a manner similar to the footbrake pedal in an automobile. Pressing the brake pedal down causes hydraulic pressure to be applied to the brakes in proportion to the brake pedal force. When there is a skidding condition, the antiskid control system detects this condition and feeds back a control signal to override the pilot's braking action, and thereby reduces the brake pressure sufficiently to stop the skid (Beck Tr. 793–796; DX 107G, pp. 610–616; Hirzel Tr. 199–206). The advent of high-speed aircraft has required greater take-off and landing velocities and thus increased the distances needed to stop the aircraft. The purpose of antiskid control systems is to keep such landing distances to a minimum (Hirzel Tr. 67). All antiskid control devices operate according to recognized principles of engineering science which are commonly referred to as being in the field of feedback control systems. This Court finds that the field of feedback control systems defines the art as to which issues of anticipation

and obviousness relate under the provisions of 35 U.S.C. §§ 102 and 103.

Dr. Steven Kahne, a professor of engineering, testified at trial concerning the theory and operating principles of feedback control systems.

Mr. Arnold Beck, a Goodyear employee, testified as an expert concerning the technology of feedback control systems and implementing circuitry as they apply to antiskid control devices.

Mr. Edgar Hirzel, a Crane employee and the named patentee, testified concerning the technology of feedback control systems and implementing circuitry as it applies to antiskid control devices, as well as certain facts surrounding the development of the patent itself.

Prior to 1962, antiskid control devices were of an "on/off" type. This type included an electromechanical sensor mounted on the aircraft wheel. The sensor feeds back a signal to close a switch when the aircraft wheel decelerated at an abnormally fast rate upon landing. The switch then activated a valve which dumped hydraulic brake pressure from the wheel and allowed it to "spin up" to the rotation speed necessary to overcome a skid (Kahne Tr. 648; Hirzel Tr. 70–71). In the early 1960's, antiskid systems were modified to control brake pressure in a smooth or modulated fashion, rather than by the then existing "on/off" type mechanisms.

## I. THE PATENTS IN SUIT

The '916 patent and the '234 patents (PX–1, 2) at issue in this suit are basically identical. Plaintiff uses the term "Mark III" as the designation for the aircraft brake control system covered by claims of the two patents in suit (Hirzel Tr. 158–159).

There are three basic parts to the Mark III as disclosed in the '916 and '234 patents when these patents are applied to aircraft brakes:

(a) Wheel Speed Sensor or Transducer—A device connected to a brake wheel which produces an electrical signal related to the rotational velocity of that wheel. This portion of the feedback control system provides the actual wheel speed signal to be compared with the aircraft speed signal. The Mark III uses the same wheel speed sensor as had been used in the prior art, Mark II (Hirzel Tr. 209–210; PX–113).

(b) Control unit—An electrical circuit which receives the wheel speed signal from the wheel speed sensor, compares the speed signal with the aircraft speed. When the difference (slip error) between the two exceeds a threshold level, an error-correcting feedback control signal is provided to the brake pressure control valve (Kahne Tr. 665–669; Beck Tr. 797–799; Hirzel Tr. 199). This unit is the heart of the patents at issue.

(c) Control valve—An electro-hydraulic device which controls the pressure to the brake in response to a signal from the control unit.

The patents in issue relate specifically to the electronic circuitry for control of a wheel of a vehicle. This electronic circuitry is intended to respond, optimally, to the changing wheel speed by providing a control produced through a slip-error signal. This slip-error signal represents the difference at any given moment between the simulated velocity of the vehicle and the actual rotational velocity of the wheel. The object of this circuitry is to establish the control necessary to narrow or eliminate such slip error through release of brake pressure, so that the wheel is not allowed to rotate too slowly and thus produce a skid (PX–1, Col. 1; PX–113; Beck Tr. 797–800).

Dr. Kahne testified regarding generalized feedback control systems. Dr. Kahne stated that aircraft antiskid control systems and vehicle brake control systems are merely examples of a general class known in engineering science as feedback control systems (Kahne Tr. 646–647; Beck Tr. 796; DX–107G, pp. 610–612). Mr. Hirzel testified to the contrary (Hirzel Tr. 196). Dr. Kahne elaborated and stated that aircraft antiskid control systems and vehicle brake control systems have been used for many years as a means of control by continually

measuring an existing condition, such as vehicle velocity; using this measurement as an input factor; comparing this input to a reference signal or desired condition (velocity, for example); detecting an error or difference between the measured and the desired conditions; and providing a control signal to maintain the controlled object at the desired condition (Kahne Tr. 655–662). The object of the feedback control mechanism is to reduce to zero the error between measured condition and the desired condition. A common example of a feedback control system is a thermostatic temperature control system. The reference condition is the desired room temperature to which the thermostat is set. The actual room temperature is sensed and compared to the desired room temperature. If the difference, or error, between the actual and desired room temperatures exceeds a fixed threshold level, the furnace is turned on to raise the room temperature and thus reduce the error to zero.

## II.  ORIGIN OF THE MARK III CONTROL SYSTEM

On October 25, 1963, Crane and Douglas Aircraft Company entered into an agreement (DX–27; PX–9) which provided for the purchase by Douglas and sale by Crane, or Crane's Hydro-Aire Division, of antiskid systems for new Douglas Model DC–9 aircraft of several series as such aircraft were specified by Douglas. The first aircraft under this agreement was the DC–9, Series 10. For this series, Crane adapted its preexisting antiskid system, called the "Mark II System" (Hirzel Tr. 79).

On July 1, 1965, Crane reaffirmed the 1963 purchase and sale agreement and specifically related it for the first time to the newly-developed Series 30 of the DC–9 aircraft (PX–90). The Series 30 model was different from the previous DC–9 Series 10 aircraft by reason of its heavier weight and faster speed. Thereafter, Crane proceeded to extend its Mark III antiskid control system for that latest model of the DC–9

aircraft. On November 15, 1965, Crane made a formal technical proposal to Douglas Aircraft Company expressly to meet the requirements of the Douglas specifications (PX–13). This proposal referred to the antiskid system as a "Revised Mark II Antiskid System." Two months later, a schematic circuit drawing 42–13910 entitled "Mark III" was made (DX–1 dated January 10, 1966). This schematic drawing lists each necessary electronic component and value and contains the subject matter of claims later made in the '234 and '916 patents (DX–78; DX–1). This antiskid system was later referred to as the "Mark III System."

## III.  CLAIMS OF THE PATENTS IN SUIT

### A.  THE '234 PATENT

The claims of the '234 patent (PX–2) are directed to a time integral modulator circuit which enables the antiskid system to perform in a fashion that would allow the individual wheel brake pressure to be continuously modulated (PX–9D, p. 12). The modulator of the '234 patent is bi-directional, i.e., it generates a wheel brake control signal that is a time integral function [1] of both positive and negative variations of the error signal obtained by comparing the slip error with the threshold level. This time integral modulator was used to achieve the continuous modulation required by Douglas (DX–107G, pp. 600–601). Douglas suggested the idea of a continuous modulation of the individual wheel brake pressure to Crane. It was admitted by Crane that the use of a time integral modulator was "the natural way to do it" (DX–107G, pp. 600–601).

### B.  THE '916 PATENT

The '916 patent claims are directed to the use of two parallel wheel brake control channels having separate thresholds for responding to the slip error representing the difference between the actual wheel speed

1.  "Time integral function" is a mathematical concept which cannot be adequately expressed otherwise than through use of mathematical expressions.

and the simulated aircraft speed. The '916 specification stated:

> One of the dual outputs of the comparator means results from a minor error signal representative of incipient wheel skid .... and is utilized to effect minor relaxation of braking .... The second output of the comparator means results from a gross error or an excess deceleration ... and is utilized to further augment the brake relaxing action ....

(PX-1, Col. 1, Ins. 24–34). The primary control channel, called the pressure bias modulator or PBM control unit in the '916 patent (PX-1, element 50) responds to slip error above a lower threshold level. The functioning of this PBM channel by means of a time integral modulator is the subject of claims under the '234 patent (PX-2, Claim 1). The second control channel, called the transient control, responds to the same slip error only above a second, higher threshold level, to reduce brake pressure sharply when the aircraft is in a deep skid (PX-1, Col. 2, Ins. 61–66). Douglas required a rapid response and reduction in wheel brake pressure; the second control channel met this requirement of the Douglas specification for the DC–9, Series 30 aircraft. It is the use of the combination of two separate channels employing the same slip error to achieve both continuous modulation and rapid brake release control which plaintiff contends constitutes the substance of the '916 patent claims. The concept disclosed in the '916 patent was first proposed by Crane to Douglas in a document entitled Technical Proposal of November 15, 1965 (PX-13). This design concept was a contractual requirement of the Douglas July 1, 1965 specification for the DC–9, Series 30 aircraft (PX-9D). It was also a well-known form of providing a secondary control in aircraft antiskid systems for responding to large error signals (Beck Tr. 805–813; 824–827; Hirzel Tr. 214–215).

## IV. FINDINGS OF FACT CONCERNING VALIDITY OF THE PATENTS AT ISSUE

Both Mr. Kahne and Mr. Beck testified that the claimed inventive concepts of the '234 and '916 patents were obvious and well known in the feedback control system art prior to the Crane Technical Proposal of November 15, 1965 (Kahne Tr. 710; Beck Tr. 830). Crane's earlier Patent No. 3,245,-727 (PX-163) disclosed a time integral modulator in an older antiskid control system. Prior to the '234 patent development, it was common to generate a control signal which was a time integral function of both positive and negative variations of an analog error signal, as in analog computers and in controls for steam engines (DX–107E, pp. 443–444; Beck Tr. 795). In response to this Court's inquiry, Mr. Beck explained that Crane's Mark II system provided for time integration of both positive and negative variations of an error signal (Beck Tr. 828). Positive and negative time integration was known long before the alleged inventions in suit (Kahne Tr. 702, 703). The combined use of two or more thresholds of different levels was known in the prior art. There existed earlier Crane and earlier Goodyear antiskid systems which included two different thresholds (PX–163; Beck Tr. 806). Further, plaintiff admitted that each item in the block diagram of its patents was used in prior art antiskid systems (Hirzel Tr. 213, 215). U.S. Patents Nos. 3,034,836; 3,245,727; 3,017,145; and 3,026,148 (PX–162 through 165), the prior Douglas Aircraft Specification of July 1, 1965 (PX–90), the earlier Mark II and Goodyear antiskid systems, and prior analog computers disclose every element of the claimed subject matter in the two patents in suit. The Mark II system of Anderson Patent 3,245,727 (PX–163) was itself a two-channel device, each channel having a different threshold, clearly meeting the language of the claims of the '916 patent (Beck Tr. 809–812). Upon inquiry by the Court, Mr. Beck testified that the patents in suit merely represented refinements of Crane's earlier Mark II system requiring no creative genius (Beck Tr. 829, 830). Dr. Kahne testified in a similar fashion:

> A. (continuing) In the 1930's the lag compensation was developed by Heinrich

Body, and these lag networks, lag devices, have been used as one type of PID device as early as the Second World War.

\* \* \* \* \* \*

Q. Am I correct that what this exhibit shows, the Defendants' Exhibit No. 42, is that the idea of lag compensation was old in the art as early as World War II in these type of circumstances?

A. That's correct.

(Tr. 701–702).

In summarizing his expert opinion as to the obviousness of the two patents in suit, Dr. Kahne stated:

A. I believe that the concepts described in Hirzel patent would, in fact, have been obvious to a person skilled in the art. I would like to qualify that, however. My experiences are with people graduating from universities at the Bachelor's level; also other levels, but the Bachelor's level.

If I can assume that people who have worked in the field of automatic control have learned more, then clearly they are skilled. But certainly when a Bachelor degree graduate leaves the university, he is able to design feedback control systems using proportional integral derivative control.

Q. And that would have been true in 1965 and 1966?

A. That's correct.

(Tr. 710–711).

At trial, Goodyear raised a defense to Crane's patent validity which is known as the "on sale" defense. A patent is invalid, as a matter of law, if the claimed invention was "on sale" more than one year prior to the patent filing date. Crane filed its first application upon which the patents at issue are based, on September 1, 1967. Thus the patents would be invalid if they were placed "on sale" prior to September 1, 1966. This date is called the critical date. The evidence at trial established that Crane made numerous and extensive personal presentations and written proposals to three major customers: Douglas, Boeing, and Lockheed, prior to September 1, 1966.

Regarding Douglas, the evidence disclosed that in November of 1965, Crane prepared and submitted to Douglas, a technical proposal for an antiskid device which included a written description and drawings (PX–13, 13A). Less than two months later, Crane completed a detailed schematic drawing number 42–13910 dated January 10, 1966. This drawing included components and component values, as well as their proper interconnections (PX–126). A detailed written description of this drawing was prepared by Mr. Cook three days later and entitled "R–483" (DX–21). A physical circuit referred to as the Mark III and conforming to Drawing 42–13910 was constructed in or before January 1966. This physical circuit was successfully bench-tested and computer simulation tested by Crane in January, 1966 (PX–127, pp. 36–37). By February 1, 1966, the control circuit covered by the later-obtained claims of the '916 and '234 patents had been flight tested for performance (DX–18, PX–15, PX–127, p. 50). That same day, Crane made an unsolicited proposal of the Mark III system to Boeing for its evaluation. Subsequently, the Mark III circuit was modified. This Mark III circuit, also covered by the '916 and '234 patent claims, was installed and successfully flight tested on a Douglas DC–9, Series 10 aircraft which had been altered to simulate the new DC–9, Series 30 (PX–127, pp. 50, 53–58; DX–19, 20). This testing of the later-patented Mark III occurred before March 6, 1966. The Mark III control accomplished its intended purpose, which was to stop a vehicle (in this case an aircraft) by controlling its brakes (PX–127, pp. 55–60, 65–70). As admitted by Mr. Cook, it was "a functional operative system" as of March 1966 (PX–127, pp. 55, 56). On March 11, 1966, Crane completed a technical description of its Mark III control which discussed successful field tests of the Mark III (PX–168, p. 2) as well as actual aircraft flight test data (PX–168, p. 5) and comparative performance runs ... on the same aircraft (PX–168, p. 7). More than ten successful flight tests of the Mark III control were conducted in the first half of 1966. On each occa-

sion, the Mark III control functioned successfully to control the brakes of an aircraft (Hirzel Tr. 312–314). On March 29, 1966, Crane received from Douglas authorizations to manufacture as optional equipment, a series of ship sets of the Mark III control for specific customers of Douglas. These authorizations included two ship sets for Trans Australia Airlines (PX–18), five ship sets for Air Canada Airlines (PX–17), two ship sets for Ansett Airlines (PX–16), and thirteen ship sets for Eastern Airlines (PX–14). A specific price was set for the sale of the Mark III control by Crane to Douglas in April of 1966. On April 11, 1966, Douglas sent Crane an order for six ship sets of Mark III control (Part No. 42–139) at a price of Two Thousand Twenty-five Dollars ($2,025.00) each (PX–23). A specific delivery schedule for these six Mark III units was set "in accordance with the basic agreement" between Douglas and Crane (PX–23). Delivery was set with one unit to be shipped on July 1, 1966 and five units on August 10, 1966 (PX–25). The order and unit price of these Mark III controls were entered by Crane on its "Sales Order Master" form on May 19, 1966 with a reference "Sold to Douglas" (PX–31; DX–108, pp. 39–42, 44–50).

On April 6, 1966, Crane finished another circuit Diagram 42–15110 for the Mark III embodying the subject matter of each asserted claim of the patents in suit for presentation to Boeing (DX–93; PX–148).

By April 15, 1966, Crane had satisfied itself that the Mark III antiskid control system was not only operational for the DC–9, Series 30 aircraft of Douglas, but was ready for marketing and sale to other airframe manufacturers (Anderson Tr. 607–614; DiCecio Tr. 629–631; Cook Tr. 872–873).

Crane's Director of Engineering, Dr. Anderson, testified as follows:

... did we feel comfortable enough to propose the Mark III system for other aircraft. And at some point in time, we did because we proposed it on other aircraft.

\* \* \* \* \* \*

A. We felt comfortable with the performance potential of the Mark III or we wouldn't have proposed it to the first aircraft manufacturer.

(Tr. 610–611).

Regarding Boeing, the evidence at trial supports a finding that on February 1, 1966, Crane sent to Boeing, a proposal expressly seeking Boeing's "evaluation of the Mark III Antiskid Control System" on the 727–200 aircraft (PX–15). Crane invited Boeing to "issue a consignment purchase order." (PX–15). In April of 1966, Boeing requested a proposal for an antiskid system to be used in its supersonic aircraft (PX–30). Crane submitted a seventy-five page proposal to supply Boeing with the Mark III antiskid system (Id.) dated May 12, 1966. The proposal included a discussion of the Mark III control unit, a block diagram corresponding to the block diagram of Figure 1 of the patents in suit and full description of the other operating components. This Boeing proposal (PX–30) was signed by Crane's Director of Engineering, Dr. Anderson. When asked the purpose of this proposal, Dr. Anderson testified:

Q. But this was a proposal to sell the Mark III antiskid system for that aircraft; is that correct?

A. Correct.

(Anderson Tr. 612).

Subsequently, on August 15, 1966 and August 26, 1966, Crane also proposed the Mark III antiskid system for two other Boeing aircraft, the 707/120 and the 727/200. In its proposals, Crane advised Boeing that the Mark III was "designed and manufactured to meet present and future aircraft braking requirements" (PX–47, p. 1), and that the Mark III had been proven "during field tests" (PX–47, p. 2), and by "actual aircraft flight test data ...." (PX–47, p. 5).

These proposals submitted by Crane to Boeing for sale of the Mark III antiskid system prior to the critical date contain a printed description of the antiskid control

circuit as claimed in the '916 and '234 patents at issue in this case.

Further, the evidence establishes that Crane submitted proposals to Lockheed aircraft prior to September 1, 1966. The June 1, 1966 proposal to Lockheed included a detailed description of the antiskid control circuit as covered by the '916 and '234 patents (PX–32). Crane's proposal to Lockheed of the Mark III system stated:

> This document establishes the criteria by which Hydro-Aire will provide such equipment identified as the Hytrol Mark III .... The skid control system will provide fully modulated control of twelve main wheel brakes of the Lockheed SST
> ....

(PX–32, p. 1). On June 10, 1966, Crane made a separate proposal of the Mark III to Lockheed for its C–5A aircraft (PX–33). This proposal contained a detailed description of Crane's later-patented antiskid control circuit. In June of 1966, Mr. DiCecio, manager of Crane's Hytrol Division, was accompanied by Dr. Anderson, Mr. F. Cooper (Crane's Director of Sales), and Crane's local representative in order to propose the sale of the Mark III for the Lockheed C–5A (DX–109, pp. 41–42; DiCecio Tr. 630, 631).

Summarizing the intent of Crane's pre-critical date proposals and activities with Douglas, Boeing, and Lockheed, Crane's director of engineering during the pertinent period testified as follows:

> In other words, it was the purpose of a proposal to obtain a sale, or a commercial exploitation of what was shown in the proposal?
>
> A. Yes.

(Anderson Tr. 607).

Mr. DiCecio testified concerning the proposals sent to Douglas, Boeing, and Lockheed:

> ... Many more things were involving; that in essence, that's what the name of the game was.
>
> Q. To try and sell them, Boeing in this case, an antiskid system for their aircraft?
>
> A. Right.

(DiCecio Tr. 630).

On September 1, 1967, the '916 and '234 patents in suit were filed. The disclosure of these patents is based upon Crane drawing 42–15110 of April 1966 (PX–148) and Crane Report R–501 of August, 1966 (PX–45) which discussed the Mark III antiskid system proposed by Crane for the Boeing 707/120 aircraft (DX–110, pp. 92–93, 101; Hirzel Tr. 392–395). At trial, Crane offered testimony that the circuit was subsequently modified to (1) eliminate large signals that could have overdumped the valve control, and (2) alleviate the blowout of tires. These modifications were not disclosed to the Patent Office (PX–1, 2; Hirzel Tr. 394–395). A number of circuit changes were made after the April, 1966 drawing in order to improve performance (e.g. DX–65 through DX–73). These changes were not made in the patent application (PX–1, 2).

In its September, 1967 application, Crane labeled the circuit disclosed as its "preferred embodiment" (PX–5, p. 13), although Crane and Mr. Hirzel knew that this circuit had been modified and that a better form of the circuit was available. Mr. Hirzel testified at trial that the 1967 patent application did not disclose the best way to accomplish the invention and that subsequent changes had to be made (Hirzel Tr. 392–395). These changes were not disclosed to the Patent Office although they were known by Crane and Mr. Hirzel prior to filing the application in September of 1967.

The evidence at trial established that Mr. Hirzel conceived the concepts and circuitry of the inventions of the '916 and '234 patents. It was clear from the testimony that Mr. Cook worked under Mr. Hirzel's direction and close supervision, and that Mr. Cook merely participated in the selection of components and component values and the testing circuitry. Mr. Hirzel testified that he was the sole inventor of the patents in suit (Hirzel Tr. 395). Mr. Cook never testified that he should have been named as an inventor (Cook Tr. 858, 865, 871, 879). It is Mr. Hirzel's name which appears on the

original document which disclosed features of the patent in suit (DX–105). Defendants have failed to meet their burden of proving that Mr. Hirzel was not the inventor of the patents in issue.

## CONCLUSIONS OF LAW

Jurisdiction of this Court over this matter is pursuant to 28 U.S.C. § 1338(a). The jurisdiction of this Court is not disputed.

■ The two patents in issue concern a feedback control circuit, known as Mark III, for controlling the brakes of a vehicle (PX–1, 2). Defendant contends that the claims of the two patents at issue are invalid and therefore unenforceable. A patent will be held invalid as a matter of law where:

1) The claimed subject matter of the patent is found to have been "on sale" more than one year before the filing date of its application;

2) The claimed subject matter of the patent is found to have been published prior to the filing date of the application;

3) The claimed subject matter of the patents was anticipated by prior art;

4) The claimed subject matter would have been obvious to a person skilled in the pertinent art at the time the inventions were made;

5) The specifications for the patents failed to set forth the best mode of the invention;

6) The patents did not name the true inventors of the invention.

See: 35 U.S.C. §§ 102, 103, 112, and 116.

■ A patent is presumed to be valid and defendants bear the burden of establishing by clear and convincing evidence that the patent at issue is invalid. 35 U.S.C. § 282; *Mumm v. Jacob E. Decker & Sons*, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983 (1937).

Defendant's first defense to the validity of Crane's patents is that the patents in suit were "on sale" prior to the critical filing date of September 1, 1966. A patent for an invention which was on sale at any time more than one year before the application date is invalid. The patent law provides in pertinent part:

A person shall be entitled to a patent unless ... (b) the invention ... was in public use or on sale in this country more than one year prior to the date of the application for patent in the United States.

35 U.S.C. § 102(b).

■ The purpose of this statutory bar is to prevent the patent owner from impermissibly extending the seventeen-year period which Congress has provided for patents. It has been held by the Court of Customs and Patent Appeals that "... the inventor's loss of right to a patent follows from the attempt to profit from the invention by commercial exploitation beyond the grace period allowed by Congress." *In re Theis*, 610 F.2d 786, 792 (Cust. & Pat.App.1979); See also: *Minnesota Mining & Manufacturing Co. v. Kent Industries, Inc.*, 409 F.2d 99, 100 (6th Cir.1969).

Crane filed its first application upon which the patents in suit are based on September 1, 1967. Thus, the critical date for application of the statutory bar is September 1, 1966. As stated *supra,* Crane sent numerous proposals, personal sales representations, and written sales proposals setting the price per unit, and a delivery schedule to three major airframe manufacturers: Lockheed, Douglas and Boeing. These pre-critical date marketing activities constitute "on-sale" activity making the patents at issue invalid.

In *In re Theis, supra,* the United States Court of Customs and Patent Appeals held that on-sale occurs as a result of one or more of the following activities:

(a) a single sale of the invention prior to the critical date:

An inventor loses his right to a patent if he has placed his invention "on sale in this country more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Even a single, unrestricted sale brings

into operation this bar to patent ability. (citations omitted).

(b) an offer of the invention to potential customers prior to the critical date:

> For § 102(b) to apply it is not necessary that a sale be consummated. It suffices that the claimed invention, reduced to practice, was placed on sale, i.e. offered to potential customers prior to the critical date. (citation omitted). Even if no delivery is made prior to the critical date, the existence of a sales contract prior to that date has been held to constitute an on sale status for the invention if it has been replaced "to a reality." (citation omitted).

610 F.2d 791–792.

(c) an attempt by the inventor's company to market the invention prior to the critical date:

> "On sale" may be found from activity by the inventor or his company in attempting to market the invention.... [T]he inventor's loss of right to a patent flows from the attempt to profit from the invention by commercial exploitation beyond the grace period allowed by Congress. (citations omitted).

In the instant case, the evidence establishes that Crane conducted all of these activities. Any one of the activities listed above would invalidate the patent. Crane offered for sale and sold six units of the subsequently-patented Mark III to Douglas before the critical date of September 1, 1966 (FF 43–47). Crane further entered the unit price of $2,025.00 and entered a "Sold to Douglas" on Crane's books and records in May of 1966 (PX–31).

Additionally, Crane made proposals, personal sales representations, and delivered written sales offers of the later-patented Mark III to Boeing. Dr. Anderson testified that the purpose of these pre-critical date activities was "to sell the Mark III." (Anderson Tr. 612–613).

Crane also made sales presentations and submitted written sales proposals of the Mark III to Lockheed for use on specific Lockheed aircraft.

Crane's primary contention in opposition to Goodyear's on-sale defense is that the Mark III was not "reduced to practice" during these pre-critical date activities. Upon consideration, this Court finds Crane's contention is without merit. The evidence at trial supports a finding that the patented Mark III control defined by the claims was both operable and commercially marketable long before the critical date. The fact that some FAA tests specifically directed to the DC–9, Series 30 commercial aircraft may not have been completed until after the critical date is not relevant since these tests related to the customers' intended use and not to the invention's operability. See: *Dunlop Company, Limited v. Kelsey-Hayes Company*, 484 F.2d 407, 413 (6th Cir.1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974); *General Electric Co. v. United States*, 654 F.2d 55 (Ct.Cl.1981).

Thus, this Court finds that Crane's pre-critical sales presentations and proposals of the later-patented Mark III to three of Crane's major customers for the specific purpose of achieving sales, commercially exploited the Mark III and placed the later-patented antiskid control system on sale prior to the critical date as prohibited by 35 U.S.C. § 102(b), *supra*.

The second defense raised by Goodyear is that the claimed patents are invalid because the patents were printed in a prior publication. 35 U.S.C. § 102(b).

When an invention is disclosed in a prior-printed publication, the patent for that invention is invalid. 35 U.S.C. § 102(b) provides in part:

> A person shall be entitled to a patent unless ...
>
> (b) the invention was ... described in a ... printed publication in this or a foreign country, more than one year prior to the date of application for the patent in the United States.

The evidence at trial establishes that the subject matter described and claimed in the '916 and '234 patents was described in printed publications more than one year prior to the Hirzel patent application filing

date. The printed documents sent by Crane to its three major customers, Douglas, Lockheed and Boeing (FF 55–57) include the following:

1. Technical proposal of November 15, 1965 to Douglas (without restrictive notice) (PX–13, 13A).

2. Numerous copies of a Mark III circuit diagram 42–13910 dated January 10, 1966 to Douglas (PX–126).

3. Numerous copies of Report R–483 to Douglas (without restrictive notice) (PX–26; DX–21).

4. Seventy-page technical proposal to Boeing for its 733 SST (PX–30).

5. Report 501 on the Mark III to Boeing for its 707 (without restrictive notice) (PX–45).

6. Mark III circuit diagram 42–15110 to Boeing (PX–47, 148).

7. Sixty-seven page technical proposal of Mark III to Boeing for its 727 aircraft (PX–47).

8. Forty-two page technical proposal of Mark III to Lockheed for its SST aircraft (PX–32).

9. Sixty-four page technical proposal of Mark III to Lockheed for its C–5A aircraft (PX–33).

■ Distribution of a limited number of copies of a printed document to an interested segment of the public is sufficient to constitute a publication barring a patent pursuant to 35 U.S.C. § 102(b). In the instant case, the distribution by Crane of documents to three leading airframe manufacturers (Boeing, Douglas, and Lockheed) is publication under § 102(b). *Jockmus v. Leviton,* 28 F.2d 812, 814 (2nd Cir.1928); *Garrett Corporation v. United States,* 422 F.2d 874, 878 (Ct.Cl.1970), *cert. denied,* 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970); *Honeywell v. Sperry Rand Corp.,* 180 U.S.P.Q. 673, 710 (D.Minn.1973).

■ Plaintiff argues that some of the material it submitted to Boeing, Lockheed, and Douglas was marked "restricted" or "confidential" and thus the prior publication bar should not be applied in the instant case. Although some of the material submitted by Crane was marked "restricted," much of the material was not so marked. In any event, the mere words "restricted" or "confidential" on a document is of no consequence where plaintiff intended to and actually did distribute the documents to its major commercial customers who comprised the interested population in the United States. See *Honeywell, supra,* 180 U.S.P.Q. at 702.

Thus this Court finds that Crane's activities constitute prior publication of the patent subject matter as prohibited by 35 U.S.C. § 102(b).

Goodyear's third defense is that the claimed subject matter of the patents was anticipated by prior art and thus is invalid.

A person shall be entitled to a patent unless ...

(a) the invention was known or used by others in this country ... before the invention thereof by the applicant.

35 U.S.C. § 102(a).

Mr. Beck testified that the Anderson patent (PX–163) discloses all of the features set forth in the broad claims of the patents in suit such as plus and minus time integration of a slip-error signal as set forth in Claim 1 of the '234 patent (PX–2; Beck Tr. 828). The Anderson patent also includes the two-channel, two-threshold subject matter of the '916 patent (PX–1; Beck Tr. 809–813, 824–830). The Anderson patent was never presented to the examiner in connection with Crane's '234 application. Crane did present the prior art Anderson patent in connection with the '916 patent; however, Crane presented to the Patent Office that the Anderson patent had only a "common threshold" and did not have "dual, independent thresholds." (PX–7, Amendment dated August 21, 1972 at p. 6). This representation was erroneous (Beck Tr. 809–813, 824). The examiner allowed the claims, but based upon an erroneous representation. Considering all of the evidence presented at trial and the arguments of counsel, this Court is persuaded that the patents at issue are invalid as anticipated by the Anderson patent.

The fourth defense raised by Goodyear is that the claims of the Crane patents in suit involve subject matter that would be obvious to one of ordinary skill in the art.

■ A patent is invalid even if the invention is not identically disclosed or described as set forth in Section 102 if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. 35 U.S.C. § 103.

The Supreme Court has set forth guidelines to be followed in testing whether a claimed patent is obvious. In *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court stated:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

*Id.* at 17, 86 S.Ct. at 694. See also *Solder Removal Company v. United States International Trade Commission,* 582 F.2d 628, 634 (Cust. & Pat.App.1978).

In an electronics patent case, such as the instant suit, the scope of prior art is broad. In *Geo. J. Meyer Manufacturing Co. v. San Marino Electronic Corp.,* 422 F.2d 1285, 1288 (9th Cir.1970), the Court stated:

> ... the word "art" includes not only the knowledge accumulated with respect to a problem in a particular industry but that accumulated in those scientific fields the techniques of which have been commonly employed to solve problems of a similar kind in the particular and closely related fields....

See also *Dollar v. Syndevco,* 205 U.S.P.Q. 949 (E.D.Mich.1979), *aff'd,* 669 F.2d 1370 (6th Cir.1982); *Weather Engineering Corp. of America v. United States,* 614 F.2d 281, 286–7 (Ct.Cl.1980); *Kornylak Corp. v. United States,* 207 U.S.P.Q. 145, 159, n. 7 (Ct.Cl.1980); *Automatic Arc*

*Welding Co. v. A.O. Smith Corp.,* 60 F.2d 740, 744 (7th Cir.1932).

Plaintiff has urged this Court to limit the scope of prior art and skill to the antiskid brake control systems and to ignore the prior art in the field of feedback control systems unless specifically used for the purposes of antiskid controls.

In *Dollar Electric Co. v. Syndevco, Inc.,* 205 U.S.P.Q. 949 (E.D.Mich.1979), *aff'd,* 669 F.2d 1370 (6th Cir.1982), the Court held the patent at issue to be invalid for obviousness and stated:

> The pertinent art should not always be defined by reference to the group which will use the purported invention. It should be defined by reference to the group possessing the skills to solve the sort of problems which confronted the inventor ... no specific academic or occupational discipline functions solely in this area, these skills being nearly universal among those skilled in a host of fields, yet it is as near as I can come to a definition that will adopt what Kitch calls the "problem-solving" approach as opposed to the "product-function" approach urged by Plaintiff.

205 U.S.P.Q. at 955–956.

This Court is not persuaded by plaintiff's arguments to limit the scope of prior art and skill to the antiskid brake control system alone. Rather, this Court is persuaded that the problem confronting Mr. Hirzel was the control of a valve by appropriate feedback control means. Mr. Hirzel was skilled in the general area of feedback control systems (Hirzel Tr. 195–197) and Mr. Hirzel applied such skills to antiskid devices.

The claims of the '234 patent address a feedback control system. The system uses a wheel speed sensor to detect wheel speed. A control unit compares a wheel speed signal with a reference and feeds back an appropriate signal to control a valve for operating the brakes of a vehicle. The wheel speed sensor and valve were old even in antiskid controls (Hirzel Tr. 209–210). The '234 patent claim included con-

tinuous modulation. Mr. Hirzel testified and admitted that continuous modulation was old, even in antiskid controls (Hirzel Tr. 213). Plaintiff argues, however, that such modulation only included a time integral of *positive* variations but not negative variations as specified in Claim 1. Thus, plaintiff argues, there is a structural difference between the Anderson patent (PX–163) and the '234 patent claims. Mr. Beck disagreed and testified that there is no such difference (Beck Tr. 826–829).

Dr. Kahne testified that the use of plus and minus time integration in a single feedback control unit was a common practice in and before 1965. (Kahne Tr. 668–670, 702–703). Further, Dr. Kahne testified that in his opinion, the subject matter of the '234 patent would have been obvious to a person skilled in the art, such as a person having a bachelor's degree in electrical engineering (Kahne Tr. 710–711).

Mr. Beck agreed with Dr. Kahne that the '234 patent was obvious and did not involve creative genius.

Mr. Hirzel testified that his use of plus and minus integration was to maintain the system at the top of his "mu slip curve." However, Mr. Hirzel admitted that this was "the obvious place to operate the antiskid system" (Tr. 93), and that his use of a time integral modulator was the "natural way" to achieve continuous modulation required by the July 1965 specification since the two go "hand-in-hand" (PX–9D; DX–1076, pp. 600–601).

The claims of the '916 patent are directed primarily to the use of two parallel wheel brake control channels having separate thresholds. The first uses plus and minus time integration as discussed above concerning the '234 patent claims. Its purpose is to respond smoothly and gradually to adjust for lower level error signals. The second channel, called the "transient control" in the '916 specification is intended to respond more swiftly to adjust for higher-level error signals (for example, a deep skid).

The prior art reflects the use of a dual-channel feedback control approach by both Crane and Goodyear (PX–163). The transient control for deep skids was admitted by Mr. Hirzel to be old in the Goodyear and Crane prior art systems (DX–107D, pp. 379–380; Hirzel Tr. 213; PX–163). Mr. Beck testified that the two-channel, two-threshold approach of the '916 patent was conventional (Beck Tr. 799–800, 805–813, 824–830).

Further, Dr. Kahne testified at great length concerning the operation of the '916 patent and concluded that the two patents in suit were obvious, both to one of Dr. Kahne's skill as well as to an engineer with a bachelor's degree (Kahne Tr. 710–711).

█ Crane argues that its patents acquired commercial success and that this Court should consider this factor in its determination of the obviousness issue.

The Supreme Court has stated that if established, commercial success is but a secondary consideration. *Graham, supra,* at 17. Crane bears the burden of establishing both commercial success and a causal relationship between the claimed invention and the success. *Solder Removal Co. v. United States International Trade Commission,* 582 F.2d 628 (Cust. & Pat.App. 1978). The weight of evidence presented at trial fails to establish that the Mark III met with success, but rather was sold to relatively few aircraft manufacturers and rated "medium" by pilots who tested the system (DX–2, Section VIII, p. 2). The commercial success of the patent claims was attributable to later improvements to the system not described in the patent claims at issue. Crane's own documents state:

In the late 1960's and early 1970's improvements were made to the Mark III control concept that greatly surpassed the braking efficiencies obtainable with earlier systems including the Mark III.

(DX–2, p. 10).

Thus, this Court finds that defendant has met its burden of establishing the obviousness of the two patent claims at issue in this case.

Defendant also claims that the two patents at issue are invalid because the specifi-

cations failed to set forth the best mode of the invention contemplated by the inventor at the time of the filing of the patent at issue (35 U.S.C. § 112). The patent law requires that the application for a patent disclose the "best mode" of practicing the invention contemplated by the inventor.

> The specification ... shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112.

Defendant's patent expert testified that the purpose of the best mode requirement was to prevent a patentee from maintaining information as a trade secret that will be important to practicing the invention after the patent expires (Banner Tr. 966–968).

■ Controlling precedent establishes that the best-mode requirement of 35 U.S.C. § 112 is met when the inventor discloses what he, the inventor, contemplates to be the best mode at the time of filing. *In re Bundy*, 642 F.2d 430 (Cust. & Pat. App.1981); (Banner Tr. 922, 929, 970).

In *Union Carbide Corporation v. Borg Warner Corporation*, 550 F.2d 355 (6th Cir.1977), the court stated the reason and policy behind the best mode rule to be as follows:

> Although the statute [35 U.S.C. § 112] does not prescribe the standard according to which the best mode is to be "set forth," it would seem that it should be fully, clearly and precisely disclosed if the public is to receive the benefits intended to result from the grant of a patent monopoly.

*Id.* at 360.

The court in *Union Carbide, supra,* stated that intentional concealment is not required to establish invalidity based upon a "best mode" defense. 550 F.2d at 363. See also: *In re Sherwood*, 613 F.2d 809 (Cust. & Pat.App.1980), *cert. denied sub nom., Diamond v. Sherwood*, 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981); *Dale Electronics, Inc. v. RCL Electronics, Inc.*, 488 F.2d 382 (1st Cir.1973).

The facts disclosed at trial establish that the alleged inventions had been reduced to practice by at least early 1966. A circuit drawing of the Mark III current version was prepared in April of 1966 (PX–148, Drg. No. 42–15110). This same drawing was used by Crane when the patent application was filed one and one-half years later (PX–5, figs. 2A, 2B, Table 1; Hirzel Tr. 392–395; DX–110, pp. 92–93). Subsequently, numerous changes, including a change to prevent tire blowout, were made to improve or enhance the performance of the claimed patent, but none of these changes were reported or disclosed in the application filed September 1, 1967 (PX–5; Hirzel Tr. 392–395).

The Court is not persuaded by the arguments of Crane that the differences in the patented claims and the changes made prior to the application in September of 1967 were minor customizing changes needed to adapt the invention to certain aircraft. Rather, this Court is persuaded that the improved circuit was the best mode and that the best mode was not disclosed in the application filed on September 1, 1967. As stated above, the omission of the best mode need not have been an intentional concealment; it is enough that the best mode was not revealed. Crane's violation of this best mode requirement of 35 U.S.C. § 112 renders the patents at issue invalid.

Finally, defendant raises the defense of misjoinder or nonjoinder of inventors.

> The patent law states in pertinent part: The applicant shall make an oath that he believes himself to be the original and first inventor ....

35 U.S.C. § 115.

Where there is a joint invention involved, both joint inventors must apply:

> When an invention is made by two or more persons *jointly*, they shall apply for a patent jointly and each sign the application and make the required oath, except as otherwise provided in this title.

35 U.S.C. § 116.

■ The fact that the patents in suit name Edgar A. Hirzel as the sole inventor

of the patents in suit, is *prima facie* proof of that fact. *Amax Fly Ash Corp. v. United States*, 182 U.S.P.Q. 210, 215 (Ct.Cl.Tr. Div.1974). Defendant bears the burden of establishing a misjoinder or nonjoinder of inventors by clear and convincing evidence. *Garrett Corp. v. United States*, 422 F.2d 874, 880, *cert. denied*, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970).

The evidence at trial established that (1) Mr. Hirzel alone conceived the concepts and circuitry of the '916 and '234 patent claims; (2) Mr. Cook worked under Mr. Hirzel's direction and close supervision; (3) Mr. Cook merely participated in the selection of components and component values and the testing of circuitry; (4) both Mr. Hirzel and Mr. Cook assigned all inventions to plaintiff as part of their employment contracts with plaintiff; and (5) Mr. Hirzel's name alone appears on DX–105, the original document which discloses features of the patents in suit to plaintiff's patent counsel (P.F. 118–121).

In order to prevail in this defense, defendant must establish that Mr. Cook made some contribution to the claimed inventive thought. *Jamesbury Corp. v. United States*, 183 U.S.P.Q. 484 (Ct.Cl.Tr.Div. 1974).

Upon consideration, this Court is not persuaded that the defendant has carried its burden of proof. This is true particularly in light of the fact that the defendant has produced no evidence that Mr. Cook made any material contribution to the conception of the claimed inventions at issue. Mr. Hirzel testified that he was the sole inventor of the patents in suit (Hirzel Tr. 395). Mr. Cook has never claimed that he should have been named as an inventor (Cook Tr. 858, 865, 871, 879).

Thus, defendant's defense of misjoinder is not valid.

## CONCLUSION

In light of the foregoing, this Court finds that the patents in suit are invalid.